Michael McLANE, Appellant,

v.

Sandra Helene McLANE, Appellee.

No. 01–06–00634–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 1, 2008.

**360**

Michael Ray McLane, Richard Rauch, Houston, TX, for Appellant.

Allison Travers Hamilton, Mack J. Travers, Travers & Travers, Katy, TX, for Appellee.

Panel consists of Justices TAFT, HANKS, and HIGLEY.

### OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

Michael McLane filed a motion for en banc rehearing. We withdraw our opinion and judgment of December 20, 2007 and issue the following in their stead. We dismiss the motion for en banc rehearing as moot.

Michael McLane appeals the trial court's decision modifying his child support payments. In two issues, Michael complains of the trial court's finding that he was intentionally underemployed and its refusal to retroactively award a decrease of child support.[1] We affirm.

### Background

In July 2003, after 10 years of marriage, Michael and Sandra McLane divorced. As agreed upon, Sandra was awarded primary custody of SMM, their adopted son who was born on September 11, 1996. Michael, who is a licensed attorney, agreed to pay $800 each month in child support. Less than four months later, Michael filed a variety of motions that, among other things, sought a reduction in his child support payments.[2]

Two years later, there was a one-day bench trial on Michael's claims for a reduction in child support, and, on December 10, 2005, the associate judge issued the following report:

---

1. Should Michael ask us to construe his brief to assert additional issues, we hold that the additional points were improperly briefed and thus waived. *See* Tex.R.App. P. 38.1.

2. The cause of action for modification of child support was severed from the other causes of action.

Modification granted. [Child support] reduced to $628.55/mo [beginning] December 15, 2005. [Michael] is underemployed. [Michael's] request for retroactive reduction is denied. [Michael] has an earning capacity of at least $48,000/yr as a wage earner.

Michael appealed the intentional-underemployment ruling to the referring court,[3] and, on May 5, 2006, the presiding judge affirmed the associate judge's report. The trial court filed the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

The court finds that Michael McLane is intentionally underemployed and has an earning capacity of at least $48,000.00 a year. The application of the guidelines to gross resources of $48,000.00 a year provides a child support award of $628.55 per month.

Michael McLane graduated from South Texas College of Law in 1995, was licensed to practice law in Texas in 1996, is licensed to practice in the U.S. District Court, Southern District of Texas, has practiced law over nine years and has been licensed, has received training or has worked as a realtor, insurance salesman, financial planner and social worker.

CONCLUSION OF LAW

Guideline support is presumed to be reasonable and in the best interest of the child.

A court may apply the support guidelines to the earning potential of the obligor.

The trial court filed additional findings as follows:

FINDINGS REQUIRED BY SECTION 154.130 OF TEXAS FAMILY CODE

The application of the guidelines to the earning potential of the obligor is not unjust or inappropriate.

The monthly net resources of the obligor's earning potential per month are $3,142.75.

The monthly net resources of the obligee per month are minimal.

The percentage applied to the obligor's potential net resources for child support by the actual order rendered by the court is 20%.

The amount of child support if the percentage guidelines are applied to the obligor's net resources is $628.55.

Michael appeals the trial court's decision.

### Intentional Underemployment

■  Michael argues that the trial court erred in finding that he was intentionally underemployed because (1) there was no evidence of acts to avoid the responsibility to pay child support, (2) his income after the divorce has not decreased, and (3) there were no findings of fact or conclusions of law made by the trial court that support the conclusion that he is intentionally underemployed.[4] We disagree.

---

3.  Michael did not appeal to the trial court the associate judge's denial of his request for a retroactive decrease in child support. This does not, however, waive his right to challenge it now. *See* Tex. Fam.Code Ann. § 201.016(a) (Vernon Supp.2007). ("failure to request a de novo hearing before the referring court ... does not deprive the party of the right to appeal to or request other relief from a court of appeals or the supreme court.")

4.  In his appellate brief, Michael states that, if we uphold the trial court's ruling that he is intentionally underemployed, he "will accept the $48,000.00 ruling of the trial court" regarding his potential salary to avoid the possibility of, on remand, the trial court assessing an even higher child support payment than currently ordered based on this potential salary.

## Standard of Review

The trial court is accorded broad discretion in setting and modifying child support payments and, absent a clear abuse of discretion, the trial court's order will not be disturbed on appeal. TEX. FAM. CODE ANN. § 156.402(b) (Vernon 1996); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990); *McGuire v. McGuire*, 4 S.W.3d 382, 387 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The trial court's primary consideration in determining the merits of a request for the modification of child support payments is the best interest of the child. *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex.2002).

A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). Under the abuse of discretion standard, we review the evidence in the light most favorable to the order and indulge every presumption in favor of the trial court's order. *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992); *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied). If some probative and substantive evidence supports the order, there is no abuse of discretion. *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

## The Law

Chapter 154 of the Texas Family Code establishes a multiple-step process for determining the amount of child support. The trial court must first determine the parties' gross income, net income, and monthly net resources. And, each party is required to furnish information sufficient to identify the party's net resources and ability to pay support, such as production of copies of income tax returns, financial statements, and pay stubs. After determining the amount of net resources, the trial court must decide whether to apply the child support guidelines or whether application of the guidelines would be unjust or inappropriate. *See* TEX. FAM.CODE ANN. §§ 154.001–.309 (Vernon 2002 & Supp.2007). Importantly, a parent's child support obligation is not limited to that parent's ability to pay from current earnings; rather it extends to his or her financial ability to pay from any and all available sources. *See In the Interest of Striegler*, 915 S.W.2d 629, 638 (Tex.App.-Amarillo 1996, writ denied).

Further, a trial court may order a parent to pay child support beyond the amount the parent's income would ordinarily indicate under the guidelines if the parent could potentially earn more money but has intentionally chosen not to. *See* TEX. FAM.CODE ANN. § 154.066 (Vernon 2002) (intentional underemployment or unemployment). If the actual income of the obligor is significantly less than what the obligor could earn because of intentional unemployment or underemployment, the court may apply the support guidelines to the earning potential of the obligor. TEX. FAM.CODE ANN. § 154.066. "A parent who is qualified to obtain gainful employment cannot evade his support obligation by voluntarily remaining unemployed or underemployed." *Tenery v. Tenery*, 955 S.W.2d 337, 340 (Tex.App.-San Antonio 1997, no pet.). In order to find a parent intentionally underemployed, the evidence must show that the parent reduced his income for the purpose of decreasing his child support payments. *In re P.J.H.*, 25 S.W.3d 402, 405–06 (Tex.App.-Fort Worth 2000, no pet.). The requisite intent may be inferred from such circumstances as the parent's education, economic adversities, business reversals, business background,

and earning potential. *In re Davis,* 30 S.W.3d 609, 617 (Tex.App.-Texarkana 2000, no pet.); *In re P.J.H.,* 25 S.W.3d at 406. At the same time, the court must keep in mind a parent's right to pursue his or her own happiness. *Zorilla v. Wahid,* 83 S.W.3d 247, 253 (Tex.App.-Corpus Christi 2002, no pet.); *DuBois v. DuBois,* 956 S.W.2d 607, 610 (Tex.App.-Tyler 1997, no pet.). Once the obligor has offered proof of his current wages, the obligee bears the burden of demonstrating that the obligor is intentionally underemployed. *Zorilla,* 83 S.W.3d at 253; *DuBois,* 956 S.W.2d at 610. Intentional underemployment has been construed to mean a "voluntary choice by the obligor." *In re D.S.,* 76 S.W.3d 512, 520 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Baucom v. Crews,* 819 S.W.2d 628, 633 (Tex.App.-Waco 1991, no writ.) (affirming modification where trial court found that obligor voluntarily became underemployed).

### Analysis

Both Michael and Sandra testified at the original hearing before the associate judge and during the appeal to the trial court. They each represented themselves pro se, and the trial court had access to the record of the first proceeding. Although the trial court granted Michael's motion and reduced his child support to $628.55 per month, Michael had sought a greater reduction, from the $800/month support he had originally agreed to down to $303.77/month. He argued that, based on his actual income, the guidelines provide that his monthly support should have been $297.83 for 2003, $342.33 for 2004, and $271.15 for 2005, which yield an average of $303.77.

Michael testified that, at the time of the divorce in 2003, he had agreed to the $800 per month payments based on his "historical payment of excess income" to his wife for the previous 10 years. Despite that agreement, however, Michael testified that, in reality, he was nearly bankrupt and was in the process of preparing a bankruptcy petition at that time. He testified that a friend had convinced him not to go through with filing the petition. Michael also testified that, although he initially moved to modify the payments in 2003, more than two years before the original proceeding on his motion, he did not have adequate funds to analyze his finances and go forward with the motion until 2005. Michael testified that he did not know the exact amount of his income at the time of his divorce proceedings and only recently became aware of his actual financial status, after he hired an accountant to review his records.

Michael presented the court with a document entitled "Trend Analysis of Self–Employment Income," which he represents states his annual net income from 1995 to 2005. Michael testified that this typewritten document, which contains one entry in handwriting, reflects that his net income was trending upward from a $4,907 loss in 2002 (at the time he began paying $750 to $800 per month in child support) to an estimated $19,921.87 of positive earnings in 2004, not downward after his divorce.

Michael testified that the net income amounts in the analysis are supported by his federal income tax and social security statements.[5] However, Michael only offered into evidence his tax statements for the years 2002, 2003, and 2004, the time period shortly before and after the divorce. These statements are dated December 4, 2005, the day before the original hearing,

---

5. Michael did not offer any income tax statements to support his reported income from 1995 through 2001. Michael testified that his

2005 net income on the analysis was an estimate because his 2005 tax returns were not yet due.

and Michael testified that he had completed them just the night before.

Although he reports as personal income amounts less than what was found by the trial court, these statements also reflect that, as the sole proprietor of his law firm, Michael reported a gross income between $50,000 and $60,000 per year. Michael did not provide any verifiable supporting documentation regarding the business expenses and deductions he claims reduced his yearly net resources to an amount below the amount found by the trial court.[6] At the appeal to the trial court that was held over two months later, there was no testimony from Michael that the income tax statements for 2002, 2003, and 2004, which also state that he owes more than $12,000 and $14,000 in back taxes and penalties, had been filed with the Internal Revenue Service ("IRS") as of the time of trial or about what arrangements, if any, he had made with the IRS for the payment of those taxes and penalties.

Michael testified that he has been self-employed for more than nine years, and he has chosen to "remain self-employed rather than be controlled by someone else's morals." He has been unable to grow his business because he (1) has had to spend a lot of time defending "false claims of child abuse," (2) has had to forgo cases in remote counties due to the cost of gas, and (3) prefers to be available to attend SMM's school events. He testified that he has gotten only two jobs in the last few years—one as a "game representative helping people" at Astroworld on the weekends, but that job ended when Astroworld closed in September 2005, and the other with a law firm, where he was making $25/hour. One month after he started with the law firm, "in the chaos following Hurricane Rita he was terminated against his will and he continued working for himself since then." Michael testified that he did not have the income necessary to pay the existing child support and paying his support obligations has required him to forgo paying some of his creditors, and he could no longer tithe to his church. He had even applied for food stamps. Although Michael testified that he has chosen to remain self-employed for personal reasons, he also testified that he has applied for 14 legal jobs since the time of divorce and had only obtained the one job with a law firm paying $25 per hour.

Michael presented evidence from his clients, Tanya Stafford and Linda Kelly in an attempt to establish that Sandra was hindering his efforts to develop his practice. Stafford and Kelly both testified that they had received angry telephone calls from Sandra. During the telephone call, Stafford identified herself as one of Michael's clients, and Sandra explained that she was calling numbers from a telephone bill that had been sent to her. Sandra did not call back. Kelly, however, testified that she had known Michael for years and had socialized with Michael and Sandra when they were a couple. She said that she had received a call from Sandra during which Sandra "bad mouthed" Michael and remarked that he was an incompetent lawyer. Sandra testified that she did not know that Kelly was Michael's client. Kelly acknowledged, at trial, that she did not tell Sandra that she was Michael's client. Sandra explained that she was calling Kelly as a friend to let her know not to send a joint Christmas card to the McLanes, and, after this conversation, Sandra did not call her again.

---

**6.** Michael also presented the court with his "Profit & Loss" statement for his law practice from January to September 1995. However, Michael did not provide the court with any verifiable evidence of the amounts claimed in the statement.

Ralph Rieger, Michael's accountant, testified that he reviewed financial documents that Michael had provided to him and that he prepared the trend analysis based on those documents. He testified that, based on this analysis, Michael's current income was "right in line" with his average income.[7]

Sandra testified that it would not be in SMM's best interest for her to hurt Michael's practice. She noted that, in November 2002 prior to the divorce becoming final, Michael agreed to pay $750/month in child support, and then in June 2003, he agreed to pay $800/month.

In this case, despite Michael's argument to the contrary, there was probative evidence to support the trial court's conclusion that he was intentionally underemployed. First, there was undisputed evidence that Michael's education and expertise enable him to obtain more lucrative employment if he wanted to do so. The evidence supports the court's factual findings in its order that Michael

graduated from South Texas College of Law in 1995, was licensed to practice law in Texas in 1996, is licensed to practice in the U.S. District Court, Southern District of Texas, has practiced law over nine years and has been licensed, has received training or has worked as a realtor, insurance salesman, financial planner and social worker.

The court also heard evidence that Michael's practice areas include family law, bankruptcy, and criminal defense, and that the year Michael graduated from law school, more than 10 years ago, he re-

ceived an income of approximately $44,000 a year.

There is also evidence from Sandra that supports the conclusion that Michael became underemployed after his divorce with the intent of reducing his child support obligations. Contradicting his testimony, Sandra testified that Michael has taken lower paying jobs to reduce the amount of child support payments because he considers these payments as additional personal income to Sandra that he does not want to pay. At trial, Sandra testified as follows:

Your Honor, I believe that Mr. McLane is purposefully underemployed and that he chooses to be so because he does not want to give me money to help me financially take care of our son. He does not see this as child support. He sees it as personal income to me. As a matter of fact, he said that to me last Monday, on November 18th. His exact words to me were, "What I am giving you is second income to you." But, Your Honor, it is not income to me. That would be alimony. This is child support to help support our son.

Given the caustic nature of the McLanes' divorce proceedings and the trial court's firsthand knowledge of the history of this case, we cannot conclude that it was unreasonable for the trial court to credit Sandra's testimony as true. The record reflects that, during and after the divorce proceedings, Michael has blamed Sandra for coaching SMM to continually make out-cry allegations of abuse against him to Children's Protective Services

---

7. We note that, although Rieger testified on direct and cross examination that Michael retained his services on *July 14, 2005,* Michael's Motion for Emergency Hearing For Temporary Reduction in Child Support Based upon the Second Amended Petition to Modify Parent–Child Relationship, which was verified by Michael and dated *October 17, 2005,* repre-

sents the following to the trial court regarding this motion: "Obligor [Michael] has not been able to hire an accountant to get his affairs in order so as to produce extended records of proof of the need for child support reduction." In fact, Michael had hired an accountant, Rieger, three months before the statement was made.

("CPS"). Michael believes that Sandra has been trying to ruin his legal reputation with his clients. The record also reflects that the McLanes are so bitter toward one another that, as recently as October of 2007, they were still unwilling to put aside their differences even when confronted with the obvious fact that they were harming SMM. An example of the acrimonious nature of this relationship is revealed in the transcript from the October 26, 2007 hearing conducted by the trial court to give the CPS investigator an opportunity to update the court on the status of SMM's mental and physical health. During the hearing, the trial court made the following observations about Michael's and Sandra's continuing animosity toward each other:

> Well, the Court has told [Michael and Sandra] on numerous occasions. If I could undo an adoption, that adoption would be undone so quickly. I've actually done research to see what authority I have to undo an adoption. Unfortunately, I have none. I think it's tragic that this child was adopted.
>
> . . .
>
> Then I'm going to remind you once again the tragedy of this child and what you-all are doing. I begged you, begged you to try to do the right thing for this child, to put your own selfish needs, you know, put them aside and try real hard to work for this child. I've actually—I beg you again and again, I think it's a tragedy that you—all adopted this child, tragic for his life, but I can't undo that. And you have, I think, a legal obligation, a moral obligation, you're going to have to answer to a Judge far more significant than me at the end of your life on how you treated this child entrusted in your care. And that Judge has far more powers than I have.

At the hearing, a caseworker from CPS, Emerald Ealy, testified that, in the past year, CPS has conducted between 15–20 investigations relating to SMM. She testified that she has seen no evidence of physical abuse, but SMM says that his father is abusing him, and she does not believe that SMM is making false allegations. Ealy testified that SMM is emotionally traumatized with so much "back and forth" between his parents, and she recommended that he be removed from their homes until the conflict between the parents is resolved. At the conclusion of the hearing, the trial court, sua sponte, awarded CPS temporary managing conservatorship of SMM.

Nevertheless, Michael argues that it was an abuse of discretion for the trial court not to believe his testimony and evidence regarding his financial status, specifically his evidence that his income has not decreased since the divorce and regarding his motive for taking lesser paying jobs. He argues that the court erred in making its decision regarding his underemployment and failing to take into consideration his right to pursue happiness in his career and spend more time with his child. We disagree.

■ In this case, almost all of the evidence of Michael's finances before and after the divorce and his intent regarding the decision not to seek higher paying jobs is based on the credibility of (1) Michael's testimony or (2) documents he has created for purposes of this litigation. Where, as here, the trial court's decision regarding the appropriate amount of child support is based, in part, on the credibility of the witnesses, a matter within the trial court's purview, we will not disturb that decision on appeal. *See Whitworth*, 222 S.W.3d at 623. The trial court is the sole decider of the candor, demeanor and credibility of the witnesses in this case and it was free to believe or disbelieve Michael's testimony. *See Tucker v. Tucker*, 908 S.W.2d 530, 534

(Tex.App.-San Antonio 1995, writ denied). Contrary to Michael's assertions, the trial court was not required to accept the evidence he presented of his income and net resources as true, especially if it was unsupported by objective evidence that he did not create himself. *Friermood v. Friermood*, 25 S.W.3d 758, 760 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Glassman & Glassman v. Somoza*, 694 S.W.2d 174, 176 (Tex.App.-Houston [14th Dist.] 1985, no writ) (trial court, as fact finder, may decline to accept as true the testimony of an interested witness even if uncontradicted). Furthermore, the trial court could have inferred Michael's intent to be underemployed from his education, business background, and earning potential. *See In re Davis*, 30 S.W.3d at 617; *In re P.J.H.*, 25 S.W.3d at 406.

Because the trial court had knowledge of the case from the time of the divorce until the modification hearing, it was in a better position than this Court to consider the evidence of Michael's credibility regarding his motives and the documents he has presented to the court. *See McGuire v. McGuire*, 4 S.W.3d 382, 387 (Tex.App.-Houston [1st Dist.] 1999, no pet.); *Shoemate v. Winkley*, 505 S.W.2d 357, 358–59 (Tex.Civ.App.-El Paso 1974, no writ). Thus, given the record in this case, we hold that the trial court did not abuse its discretion in finding that Michael was intentionally underemployed and that his potential yearly income was $48,000. We hold that the record before us does not disclose a clear abuse of discretion, and we overrule this issue.

## Retroactive Award

Finally, Michael asserts that the trial court erred in denying his request that the decrease in child support apply retroactively. We disagree.

## Standard of Review

While section 156.401 empowers the trial court to modify support orders retroactively, the application of the provision is not mandatory, but, rather, is left to the broad discretion of the trial court. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 582 (Tex.App.-Houston [1st Dist.] 1997, writ denied). It is imperative that the trial court have broad discretion to decide whether all of the facts and circumstances necessitate and justify a retroactive award of support. *Id.* Accordingly, we apply here the same abuse of discretion standard that we previously applied to the court's finding of intentional underemployment. *See id.*

As noted above, the trial court had before it one day of testimony from numerous witnesses and several exhibits detailing the circumstances of the parties. A review of the record reveals that the court was presented with evidence that would support its decision to not apply the order retroactively. The record reflects that, despite his explanations as to the reason, the fact still remains that Michael originally agreed to child support payments in the amount of $800 per month, and he did not pursue the motion to modify the support order until more than two years after the motion had been filed. Furthermore, the trial court heard evidence that this reduction might cause hardship to SMM. Sandra testified that she is the primary caretaker of SMM, has negligible net resources, and cannot afford to repay several years of child support that Michael allegedly overpaid. To justify such an award, the evidence must directly support a retroactive modification. *Id.* Here, we hold that it does not, and therefore, the trial court did not abuse its discretion in denying the modification request. We overrule this issue.

## Conclusion

We affirm the trial court's modification order.